UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANTONIO C. GUZMAN,<br><br>                    Petitioner,<br><br>          v.<br><br>SCOTT FRAUENHEIM, Warden,<br><br>                    Respondent. | No.  1:16-cv-01608-DAD-JLT (HC)<br><br>**FINDINGS AND RECOMMENDATION<br>TO DENY PETITION FOR WRIT OF<br>HABEAS CORPUS**<br><br>**[TWENTY-ONE DAY OBJECTION<br>DEADLINE]** |

Petitioner is currently in the custody of the California Department of Corrections and

Rehabilitation serving a sentence of 25 years-to-life plus one year for his conviction of first

degree murder with enhancement for use of a deadly and dangerous weapon.  In this action,

Petitioner presents multiple challenges to his conviction.  The state courts' decisions to reject

these claims were not contrary to or an unreasonable application of, Supreme Court precedent.

Thus, the Court recommends the petition be **DENIED.**

**I.      PROCEDURAL HISTORY**

On January 29, 2014, Petitioner was convicted in the Merced County Superior Court of

first degree murder (Cal. Penal Code § 187(a)), with the personal use of a deadly and dangerous

weapon (Cal. Penal Code § 12022(b)(1)).  People v. Guzman, No. F069165, 2016 WL 1633108,

at *1 (Cal. Ct. App. Apr. 22, 2016), *review denied* (June 29, 2016).  On March 27, 2014,

Petitioner was sentenced to 25 years-to-life for murder, plus one year for the weapon

enhancement.  <u>Id.</u>

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA").  On April 22, 2016, the Fifth DCA issued its opinion affirming the judgment.  <u>Id.</u> Petitioner filed a petition for review in the California Supreme Court.  (LD[1] 5.)  On June 29, 2016, the petition for review was denied.  (LD 6.)

On August 12, 2016, Petitioner filed a habeas petition in the California Supreme Court. (LD 7.)  The state supreme court summarily denied the petition without comment on October 12, 2016.  (LD 8.)

On October 26, 2016, Petitioner filed the instant petition for writ of habeas corpus in this Court.  (Doc. No. 1.)  Respondent filed an answer on February 22, 2017.  (Doc. No. 13.) Petitioner filed a traverse to Respondent's answer on March 24, 2017.  (Doc. No. 17.)

## II.    FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision.[2]

### *Prosecution Evidence*

As of April 28, 2013, Christyn Aguilar resided in a house on Valencia Way in Atwater, with her mother, Bonnie Aguilar; other family members; and Andrew Sanchez. [FN2.] Christyn's boyfriend, Carlos Belmonte, stayed there occasionally, as did Joseph McDonald, who had been living in a detached garage since sometime in 2012.

> [FN2.] Undesignated dates in the statement of facts are to the year 2013. Because several persons involved in this case share last names, we refer to them by their first names for clarity. No disrespect is intended.

On April 28, McDonald began drinking beer around 10:00 a.m. or possibly a bit earlier. He continued drinking into the afternoon, when other people started to arrive at the house for a barbecue. Rachel Sanchez, Andrew's mother, arrived about 11:00 a.m. Defendant, Andrew's coworker, arrived around noon in his red or burgundy truck, then remained outside with Bonnie, Andrew, and McDonald. All were drinking. As far as Christyn could tell as she went back and forth in and out of the house, everything was peaceful and calm.

According to Bonnie, there was a running argument between defendant and McDonald concerning defendant's boots. Over the course of several hours, the argument flared up, died down, and then flared up again a number of times. [FN3] At some point, McDonald put his hands on Bonnie in a disrespectful manner. He

---

[1] "LD" refers to the documents lodged by Respondent.
[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts.  <u>Moses v. Payne</u>, 555 F.3d 742, 746 (9th Cir. 2009).

kept touching her and she kept pushing him away, then finally defendant stepped in and was able to get McDonald to stop touching her. Defendant told McDonald multiple times, "Don't bite the hand that feeds you." Defendant did not raise his voice. According to Rachel, however, Bonnie was intoxicated and was hitting and antagonizing McDonald, and trying to get defendant to beat McDonald up. She kept whispering in defendant's ear, then took him in a room for 30 minutes. This was about 1:00 p.m. When defendant came out, he had an attitude toward McDonald.

> [FN3.] Bonnie had known defendant for at least three years. She had never seen him be aggressive, even when drinking.

Between 4:00 and 4:30 p.m., Belmonte was getting ready to start the grill for the barbecue. Bonnie, defendant, McDonald, and Andrew were sitting near the grill. All were drinking beer. Defendant and McDonald were sitting about three or four feet apart. When Belmonte first saw them, they seemed to be conversing. Within about 30 seconds, however, they started arguing. McDonald's voice was raised and he acted as if he was angry. Defendant's voice was not raised, but it appeared, from the look on his face, that he was starting to get mad.

The argument lasted no more than a minute, with McDonald doing most of the talking. At some point, McDonald got out of his chair and walked toward defendant, who was still seated. Standing over defendant, McDonald told him, "If you have a problem, say it to my face and we'll take it to the back." Defendant then stood up. McDonald was still angry, while defendant still appeared calm.

According to Rachel, McDonald got up when Bonnie slapped him. McDonald said that was enough, then defendant said something to him and pointed his finger in McDonald's face. McDonald responded, "No man points his finger in my face," and "Let's take it around the corner." Defendant got angry.

Belmonte recalled McDonald and defendant walking down the driveway toward the back of the house. Belmonte followed them, because he thought they were "going to go toe-to-toe." He believed McDonald was drunk. McDonald started walking first, and passed defendant's truck. Defendant went to the driver's side of his truck. He opened the door, leaned inside, and appeared to be looking for something. He emerged a few seconds later and ran at McDonald. A white plastic sheath went flying from defendant's vicinity. Defendant had to run about 15 feet to reach McDonald, who was standing with his fists clenched about the level of his waist, like he was ready to fight. McDonald did not have anything in his hands.

Defendant started swinging a machete at McDonald in an up-and-down manner. The first blow—a powerful swing—struck the right side of McDonald's neck. McDonald brought his arms up to try to defend himself, but defendant continued to swing the weapon. At least some of the blows made contact with McDonald's body. Three to four of the swings were to McDonald's left side, like defendant was trying to get the left side of McDonald's neck. The swings were too fast for Belmonte to count, but there were more than four. They were constant, fluid motions, with no pauses in between.

Rachel recalled McDonald and defendant walking toward the backyard at the same time. Rachel was walking with McDonald and trying to calm him down. Defendant, who was slightly ahead of them, went straight to his truck and reached in the passenger side. Rachel saw defendant get something out of his truck, then saw the machete strike McDonald's face. Although McDonald had squared off

3

with his hands up to fight, he did not push or strike defendant, or make any type of aggressive hand movement. Nevertheless, defendant went straight to the truck, then kind of ran at McDonald and struck him in the face with the machete. Defendant then "persistently" swung the machete at McDonald's upper body. McDonald had nothing in his hands and did not land any blows. Rachel believed defendant swung at least eight or nine times. Before the first blow, McDonald said to defendant, "It's like that, huh?" Defendant said nothing. During the attack, McDonald kept telling Rachel to run, but she could not, because defendant pointed the machete at her and told her not to move.

McDonald was bleeding profusely, with blood squirting from his neck. Defendant backed away from him, then quickly went toward the back of the house and tossed the machete inside the attached garage. According to Belmonte, defendant had a blank expression on his face. Belmonte did not hear him say anything. Belmonte heard Christyn start to come outside, and he told her to go back in and call 911. Defendant ran to his truck and drove away. Belmonte did not "believe that he burned rubber, but he left pretty quickly." They made eye contact for a couple of seconds. Defendant looked angry.

According to Rachel, after defendant ran toward the back of the house, he came up to her, looking confused and terrified, like he was in shock. He asked what he did, and she pointed at McDonald. Defendant looked at McDonald and then back at Rachel, and he told her to shut her mouth and not say anything. He then left quickly in his truck. McDonald asked Rachel for help. He hugged her, asked what happened and who did it, and whether he (McDonald) was wrong.

Atwater Police Officer Dasilva was dispatched to the residence at approximately 5:16 p.m. and arrived shortly after. He located a bloody machete in the garage. He received information as to two possible locations the suspect might be found. When he responded to the second one—a trailer park on Crest Road—he was informed by a neighbor that the trailer in question was occupied by an 11–year–old boy. The boy's mother was contacted and gave permission to enter.

Both doors to the trailer were locked. Dasilva knocked, but there was no response, so he kicked in the main door. He and Corporal Echevarria searched one side of the trailer, while Detective Richards and Officer Torres searched the other. Shortly after entry, Dasilva heard Torres yelling, "Show me your hands." Dasilva immediately proceeded to Torres's location in the west bedroom. There, Dasilva observed defendant and a boy lying on the bed, under the covers. Torres continued to give commands, but defendant did not comply with them. He had his hands concealed and the boy was a potential hostage, so Dasilva used his Taser on defendant. Defendant was then taken into custody. Richards did not smell any alcohol in the room, which was very small, and he did not observe any objective signs defendant was intoxicated.

The autopsy revealed McDonald sustained 14 chopped and incised wounds from a sharp-edged object. One wound, which involved the lower side of the face from the jaw to behind the ear, was a little more than six inches long and gaped open about one and a half inches. It severed one of the jugular veins on the right side of the neck. There were also chop injuries to the forearms and palm side of the hands and fingers. Some were quite deep. They were defensive injuries. At some point, McDonald tried to save himself by grabbing the blade. The cause of death was chopped and incised wounds of the head, neck, and arms. McDonald's blood tested negative for drugs, but his blood-alcohol level was 0.245 percent.

4

## *Defense Evidence*

Defendant testified that on the morning of April 28, he was with his family at home in the Crest Road trailer park. He telephoned Andrew, who was going to loan him $100. They met outside Bonnie's house at around 10:45 a.m., then defendant drove Andrew to a liquor store where Andrew could cash his check. At the store, Andrew cashed his check, gave defendant the loan, and bought some beer. They returned to Bonnie's house just before noon.

Defendant parked in the driveway, then he and Andrew moved to the front part of the house near the garage. There were a patio and chairs, and Bonnie, Belmonte, and Rachel were present. Defendant did not recall McDonald being there at that time. They all sat together, drinking beer and talking for about an hour. There was no arguing that defendant could recall.

Prior to this date, defendant did not really know McDonald, although he had seen McDonald when he (defendant) went to the house to see Andrew. On April 28, defendant saw McDonald walking back and forth between the back garage and defendant's truck, then he came over and "started to be aggressive." McDonald told Bonnie she was "a bitch," and Bonnie told him to stop "talking shit." Defendant tried to calm them down so the situation would not get worse. In a normal voice, he said McDonald should not treat Bonnie like that, because she was renting to him and giving him food. Defendant did not say this directly to McDonald, however.

At some point, Bonnie and defendant went inside the house. Bonnie said McDonald was being aggressive "maybe because he was drinking," and that he had tried to hit her. She told defendant to be careful.

Defendant returned to the patio area and sat back down. He tried to ignore McDonald, because he was afraid and did not want problems. Referring to defendant's boots, McDonald said he could make much better boots in prison, because those were just Mexican boots. McDonald, who was standing in front of defendant, tried to grab defendant's foot.

Defendant rose and told Andrew and McDonald that he did not want problems and was leaving. McDonald followed him and called him names, like he wanted to fight. Defendant was headed to his truck, and he tried to walk faster because he could hear McDonald behind him, telling him to stop and asking if defendant wanted to fight with him.

When defendant reached his truck, he tried to ignore McDonald. He opened the passenger door for a few seconds to see if McDonald would just walk on by. He closed the door when he realized McDonald was right behind him. McDonald said defendant was a "pussy" and struck him in the arm. [FN4.] Defendant fell against the side of the truck. McDonald then came up and said, "This is where I'm going to kill you."

> [FN4.] A photograph taken of defendant on May 10 showed a bruise on defendant's right arm. Richards and Torres testified in rebuttal that they saw defendant with his shirt off following his arrest on the night of the incident. Neither noticed any bruising on his arms or upper body.

Terrified, defendant grabbed the machete that was lying in the bed of his truck and tried to defend himself from McDonald's blows. [FN5.] Defendant was backing

up, but McDonald kept hitting him. At some point, the cover came off the machete. Defendant recalled swinging the machete to defend himself. McDonald was cut when defendant was trying to block his blows. Everything happened very quickly. When defendant was swinging the machete at McDonald, he felt "terrible fear" and his legs were shaking. Defendant actually thought he might die. He remembered McDonald trying to grab the machete. [FN6.]

> [FN5.] Defendant was aware the machete was in the truck on this day. He had purchased it at a store a few months earlier. Although he did not use it in his construction job, he sometimes had to cut branches from the tree at his house or when he was hired for odd jobs.

> [FN6.] As far as defendant could remember, Rachel was nowhere near McDonald during the fight. Defendant denied telling her not to move or raising the machete toward her.

When McDonald stopped hitting him, defendant ran away. He went to the garage and put the machete with his tools. [FN7.] He then went home. He went in his room and tried to calm down. When the police came, he did not try to hide. They did things to scare defendant's son, however, so defendant waited with the boy while they came in.

> [FN7.] Defendant did not usually store his tools there, but had left them when he dropped Andrew off, because he was planning to clean his truck.

Between the time he arrived at Bonnie's house to the time of the incident with McDonald, defendant consumed approximately six beers. He thought he "[p]ossibly" was feeling some effects from the alcohol, and he was not thinking clearly because he was so afraid. Defendant did not consider himself an aggressive person; he had never been in a fist fight before.

Griselda Lopez, who had known defendant approximately eight or nine years and had two children with him, testified she had never heard anyone say defendant was violent or acted aggressively when drinking. In her opinion, he was a calm, peaceful person.

Vivian McDonald, McDonald's ex-wife, testified concerning a physical altercation that occurred between her and McDonald on June 17, 2010.

Guzman, 2016 WL 1633108, at *1–5.

## III.   DISCUSSION

A.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution. The challenged conviction arises out of the Merced

1  County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. §

2  2254(a); 28 U.S.C.§ 2241(d).

3       On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

4  1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

5  enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases

6  filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA

7  and is therefore governed by its provisions.

8  B.       Legal Standard of Review

9       A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless

10  the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

11  that was contrary to, or involved an unreasonable application of, clearly established Federal law,

12  as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was

13  based on an unreasonable determination of the facts in light of the evidence presented in the State

14  court proceeding."  28 U.S.C. § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);

15  Williams, 529 U.S. at 412-413.

16       A state court decision is "contrary to" clearly established federal law "if it applies a rule

17  that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set

18  of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a

19  different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at 405-

20  406).

21       In Harrington v. Richter, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that

22  an "unreasonable application" of federal law is an objective test that turns on "whether it is

23  possible that fairminded jurists could disagree" that the state court decision meets the standards

24  set forth in the AEDPA.  The Supreme Court has "said time and again that 'an unreasonable

25  application of federal law is different from an incorrect application of federal law.'"  Cullen v.

26  Pinholster, 563 U.S. 170, 203 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from

27  a federal court "must show that the state court's ruling on the claim being presented in federal

28  court was so lacking in justification that there was an error well understood and comprehended in

7

existing law beyond any possibility of fairminded disagreement." <u>Harrington</u>, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. <u>Davis v. Woodford</u>, 384 F.3d 628, 637 (9th Cir. 2003) (citing <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Wiggins v. Smith</u>, 539 U.S. 510, 520 (2003); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." <u>Jeffries</u>, 114 F.3d at 1500; <u>see</u> <u>Taylor v. Maddox</u>, 366 F.3d 992, 999-1001 (9th Cir. 2004), <em>cert.denied</em>, <u>Maddox v. Taylor</u>, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision. <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 979, 803 (1991); <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993); <u>see also</u> <u>Fry v. Pliler</u>, 551 U.S. 112, 119-120 (2007) (holding that the <u>Brecht</u> standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.    <u>Review of Petition</u>

Petitioner asserts the following grounds for relief: 1) There was insufficient evidence of premeditation and deliberation to support the first degree murder conviction; 2) The trial court erred by instructing the jury that it could consider his flight as evidence of his guilt, as this was a permissive inference which affected the standard of proof; 3) Defense counsel was ineffective in failing to request CALCRIM No. 318; 4) The prosecutor presented false evidence to convict Petitioner; 5) The evidence was insufficient to support the first degree murder conviction; and 6) Appellate counsel rendered ineffective assistance.

1    1.  Claim One – Insufficient Evidence of Premeditation and Deliberation

2        Petitioner first alleges that there was insufficient evidence of premeditation and

3    deliberation to support the first degree murder charge.  This claim was raised on direct appeal to

4    the state courts.  In the last reasoned decision, the Fifth DCA denied the claim as follows:

5        Defendant contends the evidence was insufficient to support the jury's finding the
         killing was willful, deliberate, and premeditated. Accordingly, he argues, if the
6        murder conviction is allowed to stand, it must be reduced to second degree murder.
         We disagree.
7
         The test of sufficiency of the evidence is whether, reviewing the whole record in
8        the light most favorable to the judgment below, substantial evidence is disclosed
         such that a reasonable trier of fact could find the essential elements of the crime
9        beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578; accord,
         *Jackson v. Virginia* (1979) 443 U.S. 307, 319.) Substantial evidence is that
10       evidence which is "reasonable, credible, and of solid value." (*People v. Johnson,
         supra*, at p. 578.) An appellate court must "presume in support of the judgment the
11       existence of every fact the trier could reasonably deduce from the evidence."
         (*People v. Reilly* (1970) 3 Cal.3d 421, 425.) An appellate court must not reweigh
12       the evidence (*People v. Culver* (1973) 10 Cal.3d 542, 548), reappraise the
         credibility of the witnesses, or resolve factual conflicts, as these are functions
13       reserved for the trier of fact (*In re Frederick G.* (1979) 96 Cal.App.3d 353, 367).
         "Where the circumstances support the trier of fact's finding of guilt, an appellate
14       court cannot reverse merely because it believes the evidence is reasonably
         reconciled with the defendant's innocence. [Citations.]" (*People v. Meza* (1995) 38
15       Cal.App.4th 1741, 1747.) Rather, "[r]eversal on this ground is unwarranted unless
         it appears 'that upon no hypothesis whatever is there sufficient substantial
16       evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18
         Cal.4th 297, 331.)
17
         "All murder which is perpetrated by means of ... any ... kind of willful, deliberate,
18       and premeditated killing, ... is murder of the first degree." (§ 189.) "[W]illful"
         simply means "intentional." (See *People v. Moon* (2005) 37 Cal.4th 1, 29.) A
19       verdict of premeditated murder requires more than a showing of intent to kill,
         however. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) "'Deliberation' refers
20       to careful weighing of considerations in forming a course of action;
         'premeditation' means thought over in advance. [Citations.]" (*Ibid.*) Planning,
21       motive, and manner of killing are pertinent to a determination of whether
         premeditation and deliberation exist (*People v. Marks* (2003) 31 Cal.4th 197, 230;
22       *People v. Perez* (1992) 2 Cal.4th 1117, 1125; *People v. Anderson* (1968) 70 Cal.2d
         15, 26–27), "but these factors are not exclusive nor are they invariably
23       determinative. [Citation.]" (*People v. Marks, supra*, 31 Cal.4th at p. 230; see
         *People v. Thomas* (1992) 2 Cal.4th 489, 517.) "[W]hile premeditation and
24       deliberation must result from "'careful thought and weighing of considerations'"
         [citation], [the California Supreme Court] continue[s] to apply the principle that
25       '[t]he process of premeditation and deliberation does not require any extended
         period of time.'" (*People v. Bolin, supra*, 18 Cal.4th at p. 332.) "Premeditation and
26       deliberation can occur in a brief interval. 'The test is not time, but reflection.
         "Thoughts may follow each other with great rapidity and cold, calculated
27       judgment may be arrived at quickly."' [Citation.]" (*People v. Memro* (1995) 11
         Cal.4th 786, 863.)
28

Defendant's arguments notwithstanding, there is ample evidence supporting the jury's finding of premeditation. We recognize the evidence showed only that defendant carried the machete in his vehicle for use as a tool, not that he placed it there in anticipation of a violent encounter. (Cf. *People v. Lee* (2011) 51 Cal.4th 620, 636; *People v. Elliot* (2005) 37 Cal.4th 453, 471; *People v. Steele* (2002) 27 Cal.4th 1230, 1250.) Nevertheless, while there was no evidence of extensive planning or preparation, there was evidence that after arguing with McDonald and being challenged to a fight by him, defendant calmly walked directly to his truck, searched for and retrieved the machete he admitted he knew was there, then immediately rushed at the unarmed McDonald and began deliberately to inflict blows that were intended to be fatal. From this evidence, a rational trier of fact could have concluded defendant "acted after a period of reflection rather than on an unconsidered or rash impulse" (*People v. Brady* (2010) 50 Cal.4th 547, 564), and thus that he actually premeditated and deliberated, as opposed to having merely had the time to consider his actions (see *People v. Boatman* (2013) 221 Cal.App.4th 1253, 1270).

In light of the foregoing, sufficient substantial evidence supports the jury's verdict of first degree murder. (See, e.g., *People v. Nelson* (2011) 51 Cal.4th 198, 213; *People v. Manriquez* (2005) 37 Cal.4th 547, 577; *People v. San Nicolas* (2004) 34 Cal.4th 614, 658–659; *People v. Bolin, supra*, 18 Cal.4th at pp. 332–333; *People v. Sanchez* (1995) 12 Cal.4th 1, 34, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) That jurors could have concluded defendant acted pursuant to an unconsidered and rash impulse, and so was guilty, at most, of second degree murder, is immaterial. (See *People v. Booker* (2011) 51 Cal.4th 141, 173.)

Guzman, 2016 WL 1633108, at *5–6.

       a. *Legal Standard*

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in Jackson v. Virginia, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319; see also Lewis v. Jeffers, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. Jackson, 443 U.S. at 324. Sufficiency claims are judged by the elements defined by state law. Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Id. at 326.

Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction. Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings. 28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 2.

  b. *Analysis*

In this case, the state courts correctly applied the Jackson standard. Therefore, the question before this Court is whether that application was objectively unreasonable. Williams, 529 U.S. at 412-413. Review of the record reveals substantial evidence supported the finding that the murder was premeditated and deliberate.

A federal habeas court is bound by the state court's interpretation of its own law. Bradshaw v. Richey, 546 U.S. 74, 76 (2005). Therefore, the court is bound by the state court's definition of "premeditated" and "deliberate." Pursuant to Cal. Penal Code § 189, a deliberate and premeditated first degree murder requires more than a showing of intent to kill. "'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance." People v. Cage, 62 Cal.4th 256, 275-76 (2015).

"The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." People v. Koontz, 27 Cal.4th 1041, 1080 (2002). The California Supreme Court has "identified three categories of evidence relevant to resolving the issue of premeditation and deliberation: planning activity, motive, and manner of killing." People v. Streeter, 54 Cal.4th 205, 242 (2012) (citing People v. Anderson, 70 Cal.2d 15, 26-27 (1968)). "However, these factors are not exclusive, nor are they invariably determinative"; rather they are "simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse." People v. Streeter, 54 Cal.4th 205, 242 (2012) (internal citations omitted).

The record shows that Petitioner calmly walked over to his truck and retrieved a machete from under the passenger seat. (RT[3] 64-68, 317, 332.) Wielding the machete, he then ran at the victim who was standing approximately 10 to 15 feet away. (RT 69-71, 317.) The victim, however, was standing unarmed, with only his fists up to fight. (RT 71, 317-18.) Without pause, Petitioner immediately began fiercely hacking away at the victim's head, neck and upper torso with his machete. (RT 73, 317-18.) The first blow was a powerful, fast blow to the right side of the victim's neck. (RT 74-75, 319.) Petitioner then swung several times to the left side of the victim in an attempt to make contact with the victim's neck. (RT 79.) The victim did not fight back or make any aggressive movement; rather, he put his arms up defensively and yelled for Rachel to run away. (RT 106, 319-21.) Petitioner continued to strike at the victim with the machete over a period of fifteen minutes. (RT 106, 321-26.) Whenever Rachel would try to run from the attack, Petitioner would turn to her, raise his machete at her, and tell her, "Don't move." (RT 321-24.) Rachel pleaded with the petitioner to stop and told him she was calling the police, but he grabbed her phone, threw it, and told her not to call them. (RT 374-75.) He then turned back to the victim and persistently struck at him. (RT 324-25.) Ultimately, the victim was mortally wounded with fourteen "chopped incised wounds" to the head, neck and arms. (RT 106,

---

[3] "RT" refers to the Reporter's Transcript on Appeal.

273-74, 278, 319.)  Immediately after the attack, Petitioner ran to the garage and stashed the weapon.  (RT 106-108.)  He then fled the scene in his truck.  (RT 109.)

These facts provide more than sufficient evidence from which a fair-minded jurist could conclude that the jury's finding of premeditation and deliberation was reasonable.  The claim should be denied.

## 2.  Claim Two – Flight Instruction

Petitioner next alleges that the trial court violated his due process rights when it instructed the jury with CALCRIM No. 372 on flight, because the permissive inference of consciousness of guilt lessened the standard of proof of beyond a reasonable doubt.  Petitioner argues that there was nothing in his case to suggest that he fled after the shooting to avoid being arrested.

This claim was also raised and denied on direct appeal.  In the last reasoned decision, the Fifth DCA rejected the claim as follows:

> The trial court instructed the jury pursuant to CALCRIM No. 372, as follows: "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself." [FN8.] Defendant now contends the trial court erred by instructing on flight because there was no evidentiary support for such an instruction. That being the case, he argues, the instruction unconstitutionally lessened the prosecution's burden of proof. We conclude the instruction was properly given. [FN9.]
>
> > [FN8.] The trial court asked for, and both counsel agreed to, a stipulation the reading of the instructions need not be reported.
> >
> > [FN9.] The Attorney General asserts the claim has been forfeited by defendant's failure to object to the instruction in the trial court. The California Supreme Court having rejected this argument (e.g., *People v. Cage* (2015) 62 Cal.4th 256, 285; *People v. Boyce* (2014) 59 Cal.4th 672, 691, fn. 12; *People v. Rogers* (2013) 57 Cal.4th 296, 332, fn. 5; *People v. Wallace* (2008) 44 Cal.4th 1032, 1074, fn. 7; *People v. Smithey* (1999) 20 Cal.4th 936, 982, fn. 12), we do likewise. Accordingly, we do not address defendant's alternative argument defense counsel was ineffective for failing to object.
>
> "It is an elementary principle of law that before a jury can be instructed that it may draw a particular inference, evidence must appear in the record which, if believed by the jury, will support the suggested inference. [Citation.]" (*People v. Hannon* (1977) 19 Cal.3d 588, 597, disapproved on another ground in *People v. Martinez* (2000) 22 Cal.4th 750, 761–762; see *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) "In general, a flight instruction 'is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt.' [Citations.] "'[F]light

requires neither the physical act of running nor the reaching of a far-away haven. [Citation.] Flight manifestly does require, however, a purpose to avoid being observed or arrested.'" [Citations.]" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.)

Whenever the prosecution relies on evidence of a defendant's flight as tending to show guilt, an instruction on flight must be given. (§ 1127c.) "To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury could find the defendant fled and permissibly infer a consciousness of guilt from the evidence. [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.) The evidence of flight need not be uncontradicted. (*People v. Richardson* (2008) 43 Cal.4th 959, 1020.)

In the present case, there was evidence defendant quickly left the scene without either attempting to assist or summoning help for McDonald, and returned home. Although "[m]ere return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt [citations]" (*People v. Turner* (1990) 50 Cal.3d 668, 695; see *People v. Pensinger* (1991) 52 Cal.3d 1210, 1244), the prosecution's evidence, if believed, showed defendant did not merely return home and go about his normal activities. Rather, after beating a hasty retreat from the bloody scene of events, he hid in his bedroom, did not respond to law enforcement officers when they arrived at his trailer, and, even after they forced entrance, continued to hide and then refused to comply with their commands until one officer shot him with a Taser. Under the circumstances, the instruction was properly given. (See, e.g., *People v. Jackson* (1996) 13 Cal.4th 1164, 1226; *People v. Turner, supra*, 50 Cal.3d at p. 695.)

The California Supreme Court repeatedly has rejected claims the standard flight instruction creates an unconstitutional permissive inference or lessens the prosecution's burden of proof. [FN10.] (E.g., *People v. Cage, supra*, 62 Cal.4th at p. 286; *People v. Boyce, supra*, 59 Cal.4th at p. 691; *People v. Avila* (2009) 46 Cal.4th 680, 710; *People v. Kelly* (2007) 42 Cal.4th 763, 792.) Although these cases considered the version of the instruction contained in CALJIC No. 2.52, we have reached the same conclusion with respect to CALCRIM No. 372. (*People v. Hernández Ríos* (2007) 151 Cal.App.4th 1154, 1159.) To the extent defendant is arguing the instruction had such an effect when applied specifically to him, we reject his claim in light of the evidence presented at trial.

> [FN10.] A permissive inference allows, but does not require, the trier of fact "to infer the elemental fact from proof by the prosecutor of the basic one and ... places no burden of any kind on the defendant. [Citation.]" (*Ulster County Court v. Allen* (1979) 442 U.S. 140, 157.) Instruction on such an inference "is invalid as a matter of due process only if there is no rational way the jury could draw the permitted inference. [Citations.]" (*People v. Pensinger, supra*, 52 Cal.3d at pp. 1243–1244.)

Defendant says, however, that the instruction "authorized the jury to draw the inference that since [defendant] left the scene of the shooting and went back home, he killed Joseph McDonald with malice and did not act in self-defense." He says jurors could not rationally have made this connection on the facts of the instant case; hence, the instruction undermined the presumption of innocence. We disagree.

So-called perfect and imperfect self-defense—as to both of which the jury was instructed—each requires an actual fear of imminent harm. (*People v. Butler*

(2009) 46 Cal.4th 847, 868.) The California Supreme Court has explained that "the flight instruction, as the jury would understand it, does not address the defendant's specific mental state at the time of the offenses, or his guilt of a particular crime, but advises of circumstances suggesting his consciousness that he has committed some wrongdoing. [Citations.]" (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1160, disapproved on another ground in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22.) In the present case, the instruction was supported by the evidence, and flight was relevant to the issue whether defendant had an actual belief his life was in imminent danger and so he bore no criminal responsibility for McDonald's death. (See *People v. Zambrano, supra*, at p. 1160.)

Guzman, 2016 WL 1633108, at *6-7.

*a. Legal Standard and Analysis*

This Court is bound by the state court's determination that CALCRIM No. 372 was properly given as a matter of California law. See Bradshaw v. Richey, 546 U.S. 74, 76 (2005). Thus, this Court has determined: "whether or not the jury instruction on flight correctly stated California law or was applicable under California law to the charges against petitioner is not cognizable in [a] federal habeas petition." Wright v. Hedgpeth, 2012 WL 1194853, *23 (E.D. Cal. 2012). Accordingly, this Court's review is limited to whether the flight instruction violated Petitioner's right to due process.

A permissive inference does not require a jury to draw a conclusion, but "suggests to the jury a possible conclusion to be drawn if the State proves predicate facts." Francis v. Franklin, 471 U.S. 307, 314 (1985). Permissive inference instructions are constitutional unless the conclusions the instruction suggests cannot be justified by reason and common sense in light of the proven facts before the jury. Id. at 314-15; Hanna v. Riveland, 87 F.3d 1034, 1037 (9th Cir.1996); United States v. Warren, 25 F.3d 890, 897 (9th Cir.1994). Significantly, there is no "clearly established federal law as determined by the Supreme Court" that prohibits an instruction that would permit an inference of guilt from evidence of flight. Houston v. Roe, 177 F.3d 901, 910 (9th Cir. 1999). Therefore, a permissive inference instruction does not affect the application of the "beyond a reasonable doubt" proof standard unless there is no rational way the jury could make the connection permitted by the inference. United States v. Warren, 25 F.3d 890, 897 n. 4 (9th Cir. 1994).

Under California law, a flight instruction "is proper where the evidence shows that the

15

defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." People v. Ray, 13 Cal.4th 313, 345 (1996); Cal.Penal Code § 1127c. In this case, immediately after the machete attack, Petitioner ran to the garage and stashed his weapon. (RT 106-09.) He then ran to his truck and hurriedly drove away. (RT 109, 328, 334.) Once there, he hid at his home under blankets in his bedroom and refused to come out. (RT 196.) He was taken into custody only after officers utilized a Taser to subdue him. (RT 197.) As the Fifth DCA reasonably concluded, the evidence could allow a rational jury to infer that Petitioner fled the scene under circumstances suggesting that Petitioner's movement was motivated by a consciousness of guilt. Thus, the permissive inference was one "that reason and common sense justify in light of the proven facts before the jury." Francis, 471 U.S. at 314–15; Warren, 25 F.3d at 898.

Furthermore, permissive inference instructions generally do not result in constitutional error where, as here, other instructions "condition, qualify or explain them." Hanna, 87 F.3d at 1038; Warren, 25 F.3d at 899 (problems can be avoided "if other instructions condition and qualify the permissive inference instruction, so as to make clear that the judge is not implying the jury should return a guilty verdict"). Here, the jury was instructed on the presumption of innocence (CALCRIM No. 220), the prosecution's burden of proving Petitioner's guilt beyond a reasonable doubt (CALCRIM No. 225), and the fact that evidence of flight or attempted flight could not prove guilt by itself (CALCRIM No. 372). The jury is presumed to have followed its instructions. See Weeks v. Angelone, 528 U.S. 225, 226 (2000). In these circumstances, the challenged instruction did not have the effect of unconstitutionally shifting the burden of proof or otherwise violating Petitioner's constitutional rights. See Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir. 2002) (flight instruction did not violate due process, where court gave instructions regarding the evaluation of testimony and evidence, and instruction stated that flight alone was insufficient to establish guilt).

For the foregoing reasons, the appellate court's rejection of this claim was not contrary to, or an objectively unreasonable application of, any clearly established Federal law as determined by the United States Supreme Court. 28 U.S.C § 2254(d). The claim should be rejected.

### 3. Claim Three – Ineffective Assistance of Counsel

Petitioner contends defense counsel was ineffective for failing to request that the trial court instruct the jury that it may consider Rachel's prior inconsistent statements as substantive evidence in accordance with CALCRIM No. 318.

Petitioner presented this claim on direct appeal, and the Fifth DCA denied it as follows:

Rachel spoke to a police officer on the day of the incident. She said she did not see what happened, but heard screaming from the backyard, walked outside, and saw blood shooting out of McDonald. She then applied a towel and helped him lie down. When she spoke to a defense investigator on June 14, she maintained she arrived at the residence around 4:00 p.m., went inside to take a shower, and came back outside to find McDonald bleeding and defendant's truck gone. After the morning session of the first day of the evidentiary portion of trial, however, Rachel informed both counsel that she witnessed the entire incident. As a result, the prosecutor—who had not planned on calling Rachel—called her as his witness.

Rachel's testimony is summarized in the statement of facts, *ante*. She admitted lying to the defense investigator and the police, and defense counsel thoroughly cross-examined her concerning her prior statements. Defense counsel subsequently argued to the jury that some things Rachel said probably were true, but when people who have been in such a shocking, traumatic situation look back at what happened, their brains "try[ ] to put the puzzle together, and that's exactly what happened with Rachel." Counsel argued Rachel might have seen McDonald get cut, but her testimony about standing right next to McDonald when he was being cut, and defendant telling her not to move, did not "ring true." Defense counsel did not ask the court to give CALCRIM No. 318, which would have told jurors:

"You have heard evidence of [a] statement[s] that a witness made before the trial. If you decide that the witness made (that/those) statement[s], you may use (that/those) statement[s] in two ways:

"1. To evaluate whether the witness's testimony in court is believable;

"AND

"2. As evidence that the information in (that/those) earlier statement[s] is true."

Defendant now says failure to request the instruction constituted ineffective assistance of counsel. We are not persuaded.

The burden of proving ineffective assistance of counsel is on the defendant. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) "To secure reversal of a conviction upon the ground of ineffective assistance of counsel under either the state or federal Constitution, a defendant must establish (1) that defense counsel's performance fell below an objective standard of reasonableness, i.e., that counsel's performance did not meet the standard to be expected of a reasonably competent attorney, and (2) that there is a reasonable probability that defendant would have obtained a more favorable result absent counsel's shortcomings. [Citations.] 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1003; see

17

generally *Strickland v. Washington* (1984) 466 U.S. 668, 687–694.)

"If the record contains no explanation for the challenged behavior, an appellate court will reject the claim of ineffective assistance 'unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation.' [Citation.]" (*People v. Kipp* (1998) 18 Cal.4th 349, 367.) In other words, "in assessing a Sixth Amendment attack on trial counsel's adequacy mounted on *direct appeal*, competency is *presumed* unless the record *affirmatively* excludes a rational basis for the trial attorney's choice. [Citations.]" (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1260, original italics.)

Prior inconsistent statements are admissible, pursuant to Evidence Code section 1235, "to prove their substance as well as to impeach the declarant. [Citation.]" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1144, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.) [FN11.] CALCRIM No. 318 tells jurors they may reject in-court testimony if they determine inconsistent out-of-court statements are true. (*People v. Hudson* (2009) 175 Cal.App.4th 1025, 1028; see *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 62–63.) A trial court has no duty to give such an instruction absent a request, however. (*People v. Griffin* (1988) 46 Cal.3d 1011, 1026.)

> [FN11.] Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770."

> Evidence Code section 770 states: "Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) The witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

The record on appeal sheds no light on why defense counsel did not request CALCRIM No. 318. It appears her strategy was to concede Rachel was present, but attack her credibility both by showing she lied on prior occasions, and suggesting her most recent account of events could not be trusted because the incident was so traumatizing. This latter strategy assailed Rachel's testimony without doing so in such a way that the prosecutor was likely to respond by emphasizing Rachel's testimony she lied initially because she had been threatened. The strategy also had the effect of indirectly calling Belmonte's account into question. Under the circumstances, we cannot say this strategy was unreasonable, or that there could be no satisfactory explanation for counsel's failure to request CALCRIM No. 318. Accordingly, we reject defendant's claim. (See *People v. Bell* (1989) 49 Cal.3d 502, 546.)

Even assuming defense counsel did not make a constitutionally reasonable choice to forgo CALCRIM No. 318, defendant has not shown he was prejudiced as a result. Jurors were instructed to determine the credibility of witnesses, and that in evaluating testimony, they could consider anything that reasonably tended to prove or disprove the truth or accuracy of the testimony, including, inter alia, whether the witness made a statement in the past that was inconsistent with his or her testimony, and whether the witness admitted to being untruthful. Jurors were told that if they decided a witness deliberately lied about something significant, they should consider not believing anything that witness said. In addition, jurors were

told that in deciding whether the People had proved their case beyond a reasonable doubt, the jurors were *required* to consider *all* the evidence that was received *throughout the entire trial*. Thus, as far as the jury was concerned, Rachel's entire testimony—including the prior inconsistent statements to which she herself testified—was admitted for all purposes and could be believed or disbelieved in whole or in part. (See *People v. Griffin, supra*, 46 Cal.3d at p. 1026.)

*Guzman*, 2016 WL 1633108, at *8-9.

### a. Legal Standard

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test. Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75(1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

With the passage of the AEDPA, habeas relief may only be granted if the state-court decision unreasonably applied this general Strickland standard for ineffective assistance. Knowles v. Mirzayance, 556 U.S. 111, 122 (2009). Accordingly, the question "is not whether a federal court believes the state court's determination under the Strickland standard "was incorrect but whether that determination was unreasonable–a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123. In effect, the AEDPA standard

1    is "doubly deferential" because it requires that it be shown not only that the state court

2    determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

3    Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a

4    state court has even more latitude to reasonably determine that a defendant has not satisfied that

5    standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule

6    application was unreasonable requires considering the rule's specificity.  The more general the

7    rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

8                    *b. Analysis*

9          Initially, the Court notes that the state court applied the correct federal standard, i.e.,

10   Strickland, to Petitioner's contentions regarding counsel's performance.  Hence, the only question

11   is whether, having applied the correct test, the state court's application of Strickland was

12   objectively unreasonable.  Schriro v. Landrigan, 550 U.S. 465, 473 (2007).  The Court concludes

13   that it was not.

14         Petitioner contends that counsel should have requested CALCRIM No. 318 so as to

15   instruct the jury that Rachel's prior inconsistent statement that she had not witnessed the attack

16   could be considered substantive evidence that she had lied.  While the prior inconsistent

17   statements were damaging to her credibility, the substance of the statements would not have aided

18   Petitioner.  Because there was nothing in the prior statements which would have exonerated

19   Petitioner or provided support for any affirmative defense, the statements would have served no

20   purpose aside from impeaching her credibility.  Thus, there was no need to further instruct the

21   jury that the statements could be used as evidence that she did not actually witness the attack.

22         As to attacking Rachel's credibility, defense counsel did utilize her prior statements for

23   that purpose.  Counsel's approach was to portray her as a confused witness whose account of the

24   details of the incident could not be trusted.  Counsel may have opted for this approach rather than

25   attempting to argue she made up the event, since the latter strategy would have been fruitless

26   insofar as her testimony was largely corroborated by the other eyewitness, Belmonte.  Further, as

27   discussed by the Fifth DCA, if counsel had argued instead that she was a liar, the prosecution

28   likely would have responded that her prior statements were a result of threats by Petitioner.

20

1    Therefore, rather than invite such argument, counsel was able to call her testimony into question

2    without focusing greater attention to Petitioner's threats.

3        In any case, the statement was admitted without limitation. The jury was instructed with

4    CALCRIM No. 226 which advised that the jury could consider Rachel's prior statements when

5    evaluating the believability of her trial testimony. (CT[4] 201.) The jury was further instructed that

6    it must consider all of the evidence admitted. (RT 335-36, 378.) Therefore, even though the jury

7    had not been specifically instructed with CALCRIM No. 318, presumably it would have

8    considered the substance of the evidence regardless.

9        Furthermore, Petitioner fails to demonstrate that counsel's alleged omission resulted in

10   any prejudice. As stated above, Rachel's trial testimony was largely consistent with Belmonte's

11   testimony. Thus, even if the court had given the instruction and defense counsel had argued that

12   Rachel's trial testimony was a lie, there is no reasonable likelihood that Petitioner would have

13   secured a better result. More importantly, Petitioner fails to show that there is no possibility that

14   a fairminded jurist could disagree that the state court's decision conflicts with Supreme Court

15   precedent. Harrington, 562 U.S. at 101-02.

16       4. Claim Four – Prosecutorial Misconduct

17       Petitioner next alleges the prosecution committed misconduct by knowingly presenting

18   false evidence. He points to Rachel's version of the events which changed from her initial

19   statements to the police to her testimony at trial. He disputes Rachel's testimony that she had

20   witnessed the attack, that the first blow was to the victim's neck, and that the attack was not

21   provoked by the victim. He also contends that the injuries suffered by the victim were caused by

22   the victim's attempts to take the machete away from Petitioner.

23       Petitioner presented this claim by habeas petition to the California Supreme Court, which

24   denied the claim without comment.

25       *a. Legal Standard*

26       A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected

27   the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v.

28   _____
     [4] "CT" refers to the Clerk's Transcript on Appeal.

DeChristoforo, 416 U.S. 637, 643 (1974). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667 (1985)). Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial. Id. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994). The court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." Smith v. Phillips, 455 U.S. 209, 219 (1982). If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). See Thompson v. Borg, 74 F.3d 1571, 1577 (9th Cir. 1996) (Only if constitutional error is established "would we have to decide whether the constitutional error was harmless.").

The knowing use of false or perjured testimony against a defendant to obtain a conviction is unconstitutional. Napue v. Illinois, 360 U.S. 264 (1959). In Napue, the Supreme Court held that the knowing use of false testimony to obtain a conviction violates due process regardless of whether the prosecutor solicited the false testimony or merely allowed it to go uncorrected when it appeared. Id. at 269. The Court explained that the principle that a State may not knowingly use false testimony to obtain a conviction - even false testimony that goes only to the credibility of the witness - is "implicit in any concept of ordered liberty." Id.

To establish a claim under Napue, a petitioner must show that "(1) the testimony (or evidence) was actually false, (2) the prosecutor knew or should have known that the testimony was actually false, and (3) the false testimony was material." United States v. Zuno-Arce, 339 F.3d 886, 889 (9th Cir. 2003).

As to the first element, simple inconsistencies in testimony are insufficient to establish that a prosecutor knowingly permitted the admission of false testimony. United States v. Zuno-Arce, 44 F.3d 1420, 1423 (9th Cir.1995). "Discrepancies in . . . testimony . . . could as easily flow from errors in recollection as from lies." Id. Further, "[t]he fact that a witness may have

22

made an earlier inconsistent statement, or that other witnesses have conflicting recollections of events, does not establish that the testimony offered at trial was false." United States v. Croft, 124 F.3d 1109, 1119 (9th Cir. 1997).

### b. Analysis

At trial, Rachel testified that she witnessed the machete attack. However, in prior statements Rachel stated that she had not witnessed the attack and only witnessed the aftermath. Petitioner argues that this inconsistency shows the victim lied at trial and the prosecutor knowingly presented false evidence by eliciting this testimony.

The claim fails on its face because Petitioner does not demonstrate that the victim's trial testimony was actually false. Inconsistent statements alone do not prove false testimony. Croft, 124 F.3d at 1119. More importantly, Petitioner fails to establish that the prosecutor knew the trial testimony to be false. The victim stated that her trial testimony was true and she had previously provided false statements because Petitioner had threatened her. (RT 336, 370.) The prosecutor reasonably could have believed this representation. In addition, Rachel's trial testimony was corroborated by Belmonte and the physical evidence of the attack. For the same reasons, Petitioner's dispute with Rachel's testimony that the first blow landed across the victim's face and that the victim did not provoke the attack fails.

Thus, Petitioner fails to establish prosecutorial misconduct, and the state court rejection of this claim was not objectively unreasonable. Ultimately, the discrepancies pointed out by Petitioner do not constitute evidence of false testimony but rather were factual questions to be determined by the jury.

### 5. Claim Five – Insufficient Evidence of First Degree Murder

Petitioner contends that the evidence was insufficient to support a conviction for first degree murder. Rather, the evidence only showed that he "killed Mr. McDonald during a sudden quarrel or heat of passion" or "imperfect self-defense." (Pet. at 21-29.) Petitioner presented this claim in his habeas petition to the California Supreme Court where it was summarily denied without comment.

The standard for an insufficiency of the evidence claim is set forth in Claim One, *supra*.

To reiterate, a "federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court." Coleman v. Johnson, 566 U.S. 650, __, 132 S.Ct. 2060, 2062 (2012). The jury's verdict may be set aside "on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos, 565 U.S. at 2.

Under California law, murder is defined as "the unlawful killing of a human being, or a fetus, with malice aforethought." Cal. Penal Code § 187. In relevant part, murder in the first degree is "any . . .willful, deliberate, and premeditated killing." Cal. Penal Code § 189. As discussed in Claim One, *supra*, there was substantial evidence that Petitioner killed McDonald with deliberation and premeditation. According to the record, Petitioner calmly and coolly retrieved a machete from his truck, rushed toward the unarmed 61-year old victim, and repeatedly hacked at him across the head and neck over a fifteen-minute period, ultimately leaving the victim with "blood running and squirting out" of his neck, his hand "cut open and sliced in half," "his face wide open," and "the top of his head . . . open." (RT 106, 329, 335, 339.) From this evidence, a rational trier of fact could certainly agree with the jury's verdict.

Petitioner argues that the murder showed he acted in a heat of passion or under a sudden quarrel, but as correctly stated by Respondent, it is inconsequential whether the evidence supported a lesser offense, and it is beyond the scope of federal review to redetermine the facts. Cavazos, 565 U.S. at 2, 8 ("[I]t is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial. . . . [It] is not the job of this court . . . to decide whether the State's theory was correct. The jury decided that question, and its decision is supported by the record.").

Petitioner fails to demonstrate that the state court rejection of his claim was contrary to or an unreasonable application of clearly established Supreme Court precedent. The claim should be denied.

6.  Ineffective Assistance of Appellate Counsel

In his final claim, Petitioner alleges appellate counsel rendered ineffective assistance by failing to raise the above issues on appeal, by failing to obtain the voir dire transcripts of the

jurors prior to filing an appeal, and by failing to claim a violation of due process based on the absence of the transcripts. Petitioner raised this claim in his habeas petition in the California Supreme Court, and the claim was summarily denied.

In challenges to the effective assistance of appellate counsel, the same standards apply as with the claims of ineffective assistance of trial counsel. Smith v. Robbins, 528 U.S. 259, 285 (2000); Smith v. Murray, 477 U.S. 527 (1986). In Smith, the United States Supreme Court indicated that an appellate attorney filing a brief need not and should not raise every non-frivolous claim. Robbins, 528 U.S. at 288. Rather, an attorney may select from among them in order to maximize the likelihood of success on appeal. Id. As a result, there is no requirement that an appellate attorney raise issues that are clearly untenable. Gustave v. United States, 627 F.2d 901, 906 (9th Cir. 1980); see also Gillhan v. Rodriguez, 551 F.2d 1182 (10th Cir. 1977).

Petitioner's claim is without merit because he fails to demonstrate that appellate counsel's decision was unreasonable. As discussed above, the claims that Petitioner alleges that counsel failed to raise on appeal are meritless, and appellate counsel cannot be faulted for failing to argue a meritless claim.

As to the lack of voir dire transcripts, they were omitted from the state court record because they were "not ordered transcribed." (Suppl. RT 2, 22.) Under Cal. Rules of Court § 8.320(c)(3), the "normal record" on appeal "exclude[s] the voir dire examination of jurors. . ." The voir dire transcripts may be included if a party applies for such inclusion, but the party "must describe the material to be included and explain how it may be useful in the appeal." Cal. Rules of Court §§ 8.324(b)(2), (c)(1). In this case, appellate counsel did not request the inclusion of the transcripts.

Petitioner fails to show how appellate counsel's decision was unreasonable. As pointed out by Respondent, the parties were able to agree upon the seated jurors without contention. (CT 160-62, 176-77.) Defense counsel never voiced objection to the jury selection process. And, Petitioner fails to specify any problem or issue in the proceedings in which the transcripts could have been useful. He speculates that review of the transcripts may have been helpful. This is insufficient to state a viable claim of ineffective assistance.

For the same reasons, Petitioner fails to establish any prejudice. He does not demonstrate how the transcripts would have been helpful, or how the outcome would have been any different with voir dire transcripts in hand. Therefore, Petitioner fails to show that the state court rejection of this claim was contrary to or an unreasonable application of <u>Strickland</u>. The claim should be rejected.

## IV.      RECOMMENDATION

Accordingly, the Court **RECOMMENDS** that the Petition for Writ of Habeas Corpus be **DENIED** with prejudice.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within twenty-one days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation." Replies to the Objections shall be served and filed within ten court days after service of the Objections. The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C). The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

    Dated:   **August 1, 2017**                           **/s/ Jennifer L. Thurston**
                                                           UNITED STATES MAGISTRATE JUDGE